IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

ERIC JOHNSON
    Defendant.

Criminal No.: ELH-14-312

**MEMORANDUM OPINION**

Eric Johnson, defendant, was convicted in August 2015 of conspiracy to distribute heroin and possession with intent to distribute heroin, cocaine, and cocaine base, for which he is serving a sentence of 144 months of imprisonment at FCI Cumberland. ECF 188. While self-represented, Johnson filed a motion for compassionate release. ECF 216. Then, through counsel, he filed a memorandum in support of his motion for release, pursuant to 18 U.S.C. 3582(c)(1)(A)(i). ECF 219. The memorandum is supported by exhibits. I shall refer to ECF 216 and ECF 219 collectively as the "Motion." The government's opposition is docketed at ECF 223. Defendant replied. ECF 224.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall grant the Motion.

**I. Background**

Johnson was indicted on June 24, 2014, along with four others. ECF 1. The Indictment contained a single count. *See id.* Defendant was charged with conspiracy to distribute and possess with intent to distribute 100 grams or more of heroin, cocaine, and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846. *Id.*

Defendant entered a plea of guilty to the charge on April 9, 2015 (ECF 139), pursuant to a Plea Agreement. ECF 140. In the Plea Agreement, the parties acknowledged that the charge carries a mandatory minimum sentence of five years in prison and a maximum sentence of forty years. *Id.* at 2. In addition, the parties contemplated a base offense level of 24, before deductions for acceptance of responsibility. *Id.* ¶ 6(b). But, they agreed that if defendant were found to be a career offender, then his base offense level would be 34. *Id.* There was no agreement as to defendant's criminal history. *Id.* ¶ 7.

The Plea Agreement included a stipulation of facts. *Id.* ¶ 6(a). The stipulation states, in pertinent part, *id.*:

> On a regular basis during the period of the conspiracy, members of the conspiracy obtained bulk quantities of heroin and packaged the heroin for retail distribution. On a daily basis, the prepackaged heroin was provided to the defendant who then sold the heroin to retail customers at an open-air drug "shop" in . . . Baltimore City.

The government's evidence consisted of "information provided by confidential sources, physical surveillance, and seizures of narcotics from the defendant and customers of the 'shop.'" *Id.* Johnson stipulated that it was reasonably foreseeable to him that the conspiracy involved "at least 100 grams but less than 400 grams of heroin." *Id.*

According to the Presentence Report (ECF 155, the "PSR"), Johnson qualified as a career offender, pursuant to § 4B1.1 of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). *Id.* ¶¶ 19, 48; *see id.* ¶¶ 37, 38, 43, 44. As a result, his base offense level jumped from 24 to 34, as contemplated in the Plea Agreement. *See id.* ¶¶ 18, 19. After deductions for acceptance of responsibility, Johnson had a final offense level of 31. *Id.* ¶ 22. In addition, the PSR reflects a total of 25 criminal history points (*id.* ¶¶ 45-47), with a criminal history category of VI. *Id.* ¶¶ 47, 48.

Johnson's advisory sentencing Guidelines called for a sentence ranging from 188 months to 235 months. ECF 155, ¶ 76. But, if defendant were not a career offender, he would have had a final offense level of 21, with a criminal history category of VI. His Guidelines would have called for a sentence of 77 to 96 months of incarceration.

According to the PSR, defendant has a long criminal history, dating to 1989, including several felony drug convictions in State court. *See id.* ¶¶ 25-44. As noted, defendant had 25 criminal history points. *Id.* ¶¶ 45-47. And, several of his prior offenses did not even score points. *See id.* ¶¶ 25-30, 32-35.

Of pertinence here, Johnson received relatively light sentences on various drug convictions in State courts over a fourteen-year span. In 1999, he pleaded guilty to second degree assault and misdemeanor theft. *Id.* ¶ 31. He was sentenced to four years of incarceration, of which three years were suspended. *Id.* In June 2004, defendant pleaded guilty to unlawful possession of cocaine, and was sentenced to time served of two months and five days. *Id.* ¶ 36. In June 2005, defendant was convicted of conspiracy to distribute cocaine and sentenced to time served of three months and nine days. *Id.* ¶ 39. The following month, defendant pleaded guilty to two counts of distribution of cocaine. *Id.* ¶¶ 37, 38. He received concurrent sentences of six years' imprisonment, with all but about two months suspended. *See id.* In August 2005, and again in October 2005, Johnson was convicted of violation of probation, and sentenced to concurrent eighteen-month terms of incarceration. *See id.* He was released in September 2006. *See id.*

Two and a half years later, in early 2009, Johnson pleaded guilty to possession of cocaine. *Id.* ¶ 41. He was sentenced to three years' imprisonment, with all but six months suspended. *Id.* He was released in April 2009. *Id.* In February 2011, defendant was convicted of attempted distribution of heroin and sentenced to sixty days' incarceration. *Id.* ¶ 42. In late September 2011,

he was convicted of a violation of probation, and served about three months of imprisonment. *Id.* ¶ 41.

In June 2013, Johnson was convicted of two counts of distribution of narcotics and conspiracy to distribute narcotics. *Id.* ¶¶ 43, 44. He was sentenced to fourteen years' imprisonment, with all but one day suspended as to one count, and all but two months suspended as to the other count. *Id.*

Sentencing in this case was held on August 19, 2015. ECF 187. At that time, Johnson was forty-four years of age. *See* ECF 155 at 2. The PSR reflects that he stood five feet and six inches tall and weighed 340 pounds, and that he had a prescription for high blood pressure. *Id.* ¶¶ 67, 68. In addition, defendant reported drinking three to four beers daily prior to his arrest, and to participating in drug treatment programs in 2013 and 2014 for marijuana use. *Id.* ¶¶ 70, 71. Defendant expressed an interest in receiving additional drug treatment. *Id.* ¶ 71.

The government recommended a sentence of 144 months' incarceration, which was below the advisory Guidelines range. ECF 189 at 3. I imposed that sentence, with credit dating to June 17, 2014, followed by five years of supervised release. ECF 188.

Johnson is serving his sentence at FCI Cumberland. ECF 219 at 1; ECF 223 at 1. There is no indication that defendant has committed any disciplinary infractions while incarcerated. According to his individualized reentry plan (ECF 219-3), as of January 2020 he received a work assignment as a "safety orderly." *Id.* at 1. Over the years, he completed numerous educational and rehabilitation programs, and is on a path to earn a GED. *See id.* at 1-2.

The submissions from both sides indicate that defendant has a projected release date of October 7, 2024. ECF 394-2 at 3; ECF 396 at 9; *see also Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited June 28, 2021). He has served

approximately 58% of his sentence, and approximately 68% of his sentence when accounting for good time credit. If released, he plans to live with his mother. ECF 219 at 8.

Johnson asserts that he submitted a request for compassionate release to the Warden in June 2020, and that the request was promptly denied. ECF 219 at 2. The government "agrees" that defendant has exhausted his administrative remedies. ECF 223 at 3.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing*

*Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3)

the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)     **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*,

a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling

reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason

9

that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Id.*; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III. COVID-19[1]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).[2] Defendant first sought compassionate release in July 2020. He filed another motion in January 2021. At those times, the nation was "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.

---

[1] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[2] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis.

The virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

The virus continues to afflict those residing in countries around the world. But, in recent weeks, this country has seen a considerable reduction in new cases. Nonetheless, as of June 16, 2021, COVID-19 has infected more than 33.5 million Americans and caused approximately 600,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ.,

https://bit.ly/2WD4XU9 (last accessed May 7, 2021). Although new COVID-19 cases are reported every day, the numbers are far below what we saw earlier, and with far fewer deaths.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, and November 2, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. On March 29, 2021, to reflect the most recently available data, the CDC again revised its guidance. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 29, 2021), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; and substance use disorders. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr.

3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since expanded considerably, and the vaccine is now available to all persons twelve years of age and older. Approximately 54% of the eligible population, and 57% of all persons eighteen years of age and older, is fully vaccinated. *See See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited June 29, 2021). And, 46% of the total U.S. population is fully vaccinated. *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of

15

the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of June 29, 2021, the BOP had 129,459 federal inmates and 36,000 staff. And, by that date, the BOP had administered 197,847 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed June 29, 2021).[3]

As of June 29, 2021, BOP reported that 52 inmates out of a total of 129,459 inmates, and 133 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 44,295 inmates and 6,882 staff have recovered from the virus; and 240 inmates and four staff members

---

[3] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

have died from the virus. Moreover, the BOP has completed 115,652 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Cumberland, were the defendant is imprisoned, the BOP reported that as of June 29, 2021, out of a total of 981 inmates, none has tested positive. One staff member has tested positive. And, 337 inmates and 58 staff have recovered at the facility. In addition, 190 staff members and 618 inmates at FCI Cumberland have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, *supra*; *FCI Cumberland*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/alf/ (last visited June 29, 2021).

## IV. Discussion

Johnson has moved for compassionate release on the ground that his medical conditions render him particularly vulnerable to COVID-19. ECF 219 at 3-5. In particular, he asserts that he suffers from hypertension, congestive heart failure, asthma, Type 2 Diabetes, and obesity, among other conditions. *Id.* The government concedes that defendant's afflictions satisfy the "extraordinary and compelling" prong of the § 3582 analysis. ECF 223 at 4. But, that does not end the inquiry.

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

The Court must also consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A). These include: (1) the nature of the offense and the defendant's

17

characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Johnson acknowledges the seriousness of his offense. ECF 219 at 7. But, he notes that it involved "neither weapons nor allegations of violence," and that the conspiracy in which he was involved was "short-lived." *Id.* Moreover, defendant points out that his clean disciplinary record during the sentence and his commitment to various educational and rehabilitative programs indicate that he is "embarking on a positive path." *Id.* at 8. For these reasons, coupled with the fact that he is now fifty years of age, defendant asserts that he no longer poses a danger to society. *See id.*

The government disagrees. ECF 223 at 4-5. It observes that "much of Johnson's adult life has been spent moving in and out of the criminal justice system." *Id.* at 5. And, despite having had several opportunities "to alter the trajectory of his life . . . he has chosen not to do so." *Id.*

In his reply, Johnson contends that as a result of changes in the law, if he were sentenced today he would no longer qualify as a career offender. ECF 224 at 3. He correctly asserts that if he had not been deemed a career offender at sentencing, he would have had a final offense level of 21 and a criminal history category of VI, which correspond to a Guidelines recommendation of 77 to 96 months of imprisonment. *Id.* Although this argument was raised for the first time on reply, the government has not sought leave to file a surreply or otherwise taken issue with it.

Indeed, at the time of defendant's offense, conspiracy to distribute a controlled substance under 21 U.S.C. § 846 was considered a career offender predicate offense under U.S.S.G. § 4B1.2(b). But, in *United States v. Norman*, 935 F.3d 232, 238-39 (4th Cir. 2019), the Fourth

Circuit determined that federal drug conspiracy under 18 U.S.C. § 846 is categorically not a qualifying offense for career offender purposes.

As the Supreme Court has explained, the Guidelines are "the starting point and the initial benchmark" at every sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007); *see Freeman v. United States*, 564 U.S. 522, 529 (2011) ("The Guidelines provide a framework or starting point ... for the judge's exercise of discretion."); *see United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). Indeed, the Court has instructed that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49. Therefore, although I departed significantly below the Guidelines in sentencing Johnson, my initial starting point was 188 to 235 months, rather than 77 to 96 months. And, I also considered the government's recommendation of 144 months. Undoubtedly, that recommendation took the Guidelines into account.

Moreover, Johnson's behavior while in BOP custody is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see also United States v. Scott*, CCB-95-202, 2020 WL 2467425, at *4 (D. Md. May 13, 2020). As mentioned, there is no indication that defendant committed any infractions during his time in custody. And, he has shown that he has committed himself to education and rehabilitation.

Viewed from the current perspective, Johnson's incarceration—for a period of about 84 months—is considerably longer than any prison sentence he ever previously served. And, it is sufficient to serve the goals of incapacitation, deterrence, retribution, and rehabilitation.

19

## V. Conclusion

For the reasons set forth above, I shall grant the Motion (ECF 216, 219). I shall also reimpose the original terms of supervised release, with the added condition of a period of six months of home confinement.

An Order follows, consistent with this Memorandum Opinion.

Date: June 30, 2021            /s/
                               Ellen L. Hollander
                               United States District Judge